IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 10, 2013 Session

## IN RE GABRIEL B. ET AL.

**Appeal from the Juvenile Court for Monroe County**
**No. J12-171      J. Reed Dixon, Judge**

_____

### No. E2013-01581-COA-R3-PT-FILED-MARCH 28, 2014

_____

This is a termination of parental rights case, focusing on Gabriel B., Gracie B., and Zachary B., the minor children ("Children") of Donna B. ("Mother") and Richard B. ("Father"). The Children were taken into protective custody by the Tennessee Department of Children's Services ("DCS") on June 9, 2011, after they had been found in the care of an inappropriate caregiver while Mother was out of state. On April 19, 2012, DCS filed a petition to terminate the parental rights of Mother and Father. Father subsequently surrendered his parental rights to the Children and is not a party to this action. Following a bench trial held on November 9, 2012, and January 4, 2013, the trial court granted the petition upon its finding, by clear and convincing evidence, that (1) Mother had abandoned the Children by failing to provide a suitable home, (2) Mother had failed to substantially comply with the permanency plans, (3) the conditions causing the removal of the Children into protective custody persisted, and (4) Mother's mental condition was impaired to the point of being unable to provide for the further care and supervision of the Children. The court further found, by clear and convincing evidence, that termination of Mother's parental rights was in the Children's best interest. Mother has appealed. Discerning no error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Steven B. Ward, Madisonville, Tennessee, for the appellant, Donna B.

Robert E. Cooper, Jr., Attorney General and Reporter, and Mary Byrd Ferrara, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

DCS initially became involved with the Children through an anonymous referral alleging abuse and neglect in May 2011. At the time, Gabriel was five years old, Gracie was three years old, and Zachary was eleven months old. DCS investigated the circumstances and worked with Mother in her home for two to three weeks to ensure proper care of the Children. Mother and the Children had moved from Florida to Tennessee in early May 2011 and were living in an apartment in Madisonville. On June 6, 2011, Mother informed her DCS case manager, Jodi Skiles, that she was traveling to Florida and taking the Children with her. Mother, however, left the Children with a neighbor, S.D., in the apartment complex when she left for Florida.

On June 8, 2011, at nearly midnight, S.D. contacted Monroe County law enforcement officials to report that Mother had abandoned the Children. S.D. sent a text message to Mother, stating that she had reported Mother to the police. Calling from the road, Mother spoke with a police officer who was at S.D.'s apartment. The officer informed Mother that S.D. had left the Children in the care of an apartment complex maintenance worker who was a registered sex offender. Mother then contacted Ms. Skiles and asked her to check on the Children, stating that she was traveling on the highway at the Georgia-Florida border. Ms. Skiles investigated the situation, brought the Children to the DCS office, and called Mother. Mother assured Ms. Skiles that she would return to Tennessee immediately. By 11:00 a.m. the next day, Mother had not returned and had provided no definite arrival time. DCS petitioned the trial court for an emergency protective custody order, which the court granted on June 9, 2011.

Mother arrived at the DCS office in Monroe County in time to attend a child and family team meeting and participate in the development of an initial permanency plan on June 10, 2011. Having driven a rental truck, she slept in the vehicle in the DCS parking lot for two nights, with DCS personnel providing her food and a medical referral. According to DCS personnel, Mother gave various reasons for her failure to arrive earlier to retrieve the Children, including that her vehicle had broken down, that a female traveling companion, M.F., had refused to return to Tennessee, and that she had been kidnapped by M.F. At trial, Mother testified that M.F. had disappeared in Georgia with the truck and Mother's cellular telephone for a period of four hours and that Mother was only able to contact DCS and drive back to Tennessee after M.F. returned. Mother told DCS personnel that she was traveling to Florida to help Father and that she left the Children in Tennessee because she did not want to take them into a "bad situation."

Following Mother's initial nights sleeping in the rental truck after the Children's removal, she agreed to stay in a shelter in Knoxville for one night. She then traveled to Indiana where her own foster parents lived. Jessica Buckner, who became the Children's DCS case manager upon their removal into protective custody, testified that she informed Mother of the process for obtaining an Interstate Compact on the Placement of Children ("ICPC") report on the home where Mother was living in Indiana. Mother testified that she declined the ICPC process because she was living with a friend in Indiana and the home was not suitable for the Children.

When Mother returned to Madisonville in September 2011, she began residing with Randall A., a man she had met during the month she previously lived in Tennessee with the Children. Mother and Randall A. lived in three different locations between September 2011 and the beginning of trial in November 2012. At trial, Mother presented a lease, signed on April 27, 2012, for her most recent residence, a house off Highway 411 in Madisonville. Ms. Buckner testified that DCS did not learn of the most recent housing situation until September 2012, five months after Mother and Randall A. had executed the lease. A DCS investigation in October 2012 concluded that the home itself presented no safety concerns. Ms. Buckner testified, however, that DCS conducted a background check regarding Randall A. that revealed he was the father of a child not in his custody and had been arrested for DUI. Despite requests from DCS and inclusion of Randall A. in the most recent permanency plan, Randall A. had failed to submit to an alcohol and drug assessment or offer documentation explaining why he did not have custody of his own child by the time of trial.

Following a hearing conducted on October 20, 2011, the trial court adjudicated the Children as dependent and neglected as to Mother and entered a written order to that effect on November 4, 2011.[1] DCS developed three permanency plans for the Children. The first permanency plan was established on June 27, 2011, and ratified by the trial court on October 20, 2011. Under the plan, Mother's requirements were that she undergo a psychological evaluation and follow all resultant recommendations, establish a sufficient income, establish reliable transportation, establish stable housing, and pay court-ordered child support. The permanency plan was revised in December 2011 and ratified by the trial court on February 2, 2012. In addition to the initial requirements, the revised plan required Mother to undergo a mental health assessment intake, participate in the Children's Individualized Education Plan ("IEP") meetings and medical appointments, complete parenting classes and demonstrate learned parenting skills during visitation with the Children, resolve her outstanding criminal warrants in Indiana, and resolve outstanding bills and debts. In June 2012, two months after the petition for termination had been filed, DCS developed a third

_____

[1]The trial court adjudicated the Children dependent and neglected as to Father in an order entered July 5, 2012.

permanency plan with Mother's participation. In addition to the previous requirements, this plan required Mother to pay $100 a month in child support and ensure that Randall A. submit to an alcohol and drug assessment and follow any resultant recommendations. The third permanency plan was not reviewed for ratification by the trial court prior to trial.

Mother underwent a psychological evaluation in Indiana but was dismissive of the results in speaking to DCS personnel afterward. After initially resisting a second psychological evaluation in Tennessee, Mother submitted to one in December 2011. Although mental health counseling was recommended pursuant to this evaluation, Mother refused further treatment.

Mother completed in-home parenting classes arranged by DCS, but testimony from Ms. Buckner and a therapeutic visitation supervisor demonstrated that Mother sometimes parented inappropriately during visitation with the Children, calling the oldest child derogatory names, refusing to take the Children to the bathroom until they urinated on themselves, and leaving early on one occasion because she felt the Children were not paying her enough attention. She attended one IEP meeting for Gabriel and some medical appointments for the Children, but testimony established that she was often disruptive at these appointments. Mother failed to resolve her pending criminal warrants in Indiana.

Mother testified that she was employed through several positions during the time period the Children were in protective custody, including employment at a Wendy's restaurant in Indiana; the CVG factory in Vonore, Tennessee; a Dollar General in Tennessee; and by the time of trial, Home Healthcare Services in Athens, Tennessee. Mother did not establish reliable transportation until she and Randall A. purchased a vehicle in March 2012. Mother did not pay child support at any time while the Children were in protective custody.

On April 19, 2012, DCS filed its petition seeking termination of Mother's and Father's parental rights on the statutory grounds of abandonment by failure to support, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plans, persistence of conditions that led to the Children's removal into protective custody, and mental incompetence of Mother to parent. The trial court appointed counsel for each parent and attorney Judith Hamilton as guardian *ad litem* ("GAL") for the Children. Father surrendered his parental rights to the Children on September 11, 2012.[2]

---

[2]The petition to terminate parental rights listed the biological father of the two youngest children as Father's twin brother, Michael B., whom Mother had told DCS was the father of Gracie and Zachary. Mother testified at trial that Michael B. was the biological father of all three Children. Michael B. was deceased by the time the Children were taken into protective custody. Richard B. ("Father") was still married to Mother at the time he surrendered his parental rights to all three Children.

Following a bench trial held November 9, 2012, and January 4, 2013, the trial court found, by clear and convincing evidence, that (1) Mother had abandoned the Children by failing to provide a suitable home, (2) Mother had failed to substantially comply with the permanency plans, (3) the conditions causing the removal of the Children into protective custody persisted, and (4) Mother's mental condition was impaired to the point of being unable to provide for the further care and supervision of the Children. The court further found, by clear and convincing evidence, that it was in the best interest of the Children to terminate Mother's parental rights. The trial court entered its final decree on June 17, 2013. Mother timely appealed.

## II. Issues Presented

On appeal, Mother presents five issues, which we have restated as follows:

1. Whether the trial court erred by finding there was clear and convincing evidence that Mother had abandoned the Children by failing to establish a suitable home and terminating her parental rights based on that ground.

2. Whether the trial court erred by finding there was clear and convincing evidence that Mother had substantially failed to comply with the statements of responsibilities in the permanency plans and terminating her parental rights on that ground.

3. Whether the trial court erred by finding there was clear and convincing evidence that the conditions that led to the Children's removal into protective custody persisted and terminating Mother's parental rights on that ground.

4. Whether the trial court erred by finding clear and convincing evidence that Mother's mental condition was impaired to the point of being unable to provide for the further care and supervision of the Children and terminating Mother's parental rights on that ground.

5. Whether the trial court erred by finding there was clear and convincing evidence that it was in the best interest of the Children to terminate Mother's parental rights.

### III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings.  *Id.*; Tenn. R. App. P. 13(d).  Questions of law, however, are reviewed *de novo* with no presumption of correctness.  *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary.  *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002).  It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).  As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36–1–113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence.  Tenn. Code Ann. § 36–1–113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).  The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).  Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't*

*of Children's Servs. v. Mims* (*In re N.B.*), 285 S.W.3d 435, 447
(Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

## IV. Abandonment by Failure to Provide a Suitable Home

The trial court, *inter alia*, terminated Mother's parental rights on the statutory ground that she abandoned the Children by failing to provide a suitable home for them. Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2013) provides, as relevant to this action:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Tennessee Code Annotated § 36-1-102(1)(A) (2010) defines abandonment, in relevant part, as:

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the

parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . . .

The trial court found and Mother does not dispute on appeal that DCS made reasonable efforts to assist her in establishing a suitable home. In its final judgment, the trial court included the following specific findings regarding this issue:

As evidenced by all testimony in this case, [Mother's] transient lifestyle and the fact that she has not addressed her mental health issues leave this Court no choice but to find that she has demonstrated a lack of concern for the children to such a degree that it appears unlikely that they will be able to provide a suitable home for the children at an early date. While it appears that she has been in the same living situation for quite some time, she did not make reasonable efforts to stabilize herself, her home and her personal condition in the four months after the removal despite assistance from DCS.

The evidence preponderates in favor of the trial court's factual findings. The determinative period for this analysis spans the four months beginning with the Children's removal into protective custody on June 10, 2011, and ending October 10, 2011. During this period, Mother was for the first three months living with a friend in Indiana in a home she admitted was unsuitable for the Children. During the fourth month, Mother moved to Tennessee and began residing with Randall A., whom she had met during the one month she had lived previously in Tennessee with the Children. Mother and Randall A. lived together in three different homes between September 2011 and the first day of trial in November 2012, with the most recent home being the one for which Mother produced a copy of the lease, dated April 2012, at trial.

In addition to finding that Mother's lifestyle had been "transient," the court expressly found that Mother's failure to address her mental health issues indicated unlikelihood that she would be able to provide a suitable home for the Children at an early date. *See, e.g., In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319 at *5 (Tenn. Ct. App. May 21, 2009) (concluding that "matters related to counseling and assessments" are "directly related" to the ground for termination of failure to establish a suitable home and stating: "While there is, of course, a physical element to the concept of a 'suitable home,' the problems and conditions for which the various assessment and counseling efforts were conducted address matters which make the home environment suitable for raising children and which keep them from becoming dependent and neglected.").

As DCS notes, Mother does not address directly in her brief on appeal the trial court's finding that she abandoned the Children through failure to provide a suitable home. Mother

does raise the issue, however, of the trial court's ruling as to all grounds for termination and argues that she substantially complied with the requirements of the permanency plan, one of which was to establish a suitable home. Mother's argument regarding this issue is based on the undisputed fact that at the time of trial, she was living in a home that DCS had investigated in October 2012, a month before the first day of trial, and found to be physically adequate for the Children. Mother's argument ignores two key facts regarding her living situation. First, the determinative four-month period ended six months before Mother and Randall A. procured the home they lived in at the time of trial. Second, despite requests from DCS and inclusion in the third permanency plan, Randall A. failed to procure an alcohol and drug assessment or provide DCS or the trial court with documentation as to why he did not maintain custody of his own child. Moreover, as noted above, Mother's failure to address her own mental health concerns was a primary factor in the trial court's ruling on this ground. The trial court did not err in terminating Mother's parental rights based upon this statutory ground.

## V. Substantial Noncompliance with Permanency Plans

The trial court also found clear and convincing evidence that Mother failed to substantially comply with the reasonable responsibilities set out in her permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4.

In its findings regarding Mother's efforts under the permanency plans, the trial court stated in relevant portion:

> In this case, the Court finds that there is clear and convincing evidence that [Mother] has not substantially complied with the responsibilities and requirements set out for her in the children's permanency plans. The permanency plans were reasonably related to remedying the reasons that brought the children into foster care, and were in the children's best interests.
>
> DCS provided extensive reasonable efforts as detailed above in the Findings of Fact. [Mother] completed the parenting classes and parenting assessment but has not demonstrated the learned parenting skills as evidenced by multiple witnesses about [Mother's] inappropriate comments and name-calling of the children during visitations. [Mother] has been resistant to change her methods of parenting. [Mother] did not fully cooperate with the

-9-

psychological evaluation nor has she submitted to a second mental health intake. She has not resolved her outstanding warrants and she has not participated in the medical appointments of the children and disrupted the appointments in which she did participate.

These requirements that she failed to complete are a substantial part of the permanency plan. The failure to meet these requirements means that [Mother] does not have a home for the children to return to and the children have been in foster care for twenty months. Thus the Court finds by clear and convincing evidence that [Mother] failed to substantially comply with the permanency plans in this case.

Upon careful review, we determine that a preponderance of the evidence supports these findings. It was undisputed that Mother completed the required parenting assessment and parenting classes. Her initial permanency plan and each subsequent plan also required, however, that she demonstrate learned parenting skills. Testimony supported the trial court's finding that she had not. Ms. Buckner testified that Mother failed to complete recommendations made in the parenting assessment that she undergo mental health treatment, learn age-appropriate child behaviors, and learn the difference between regular and special needs age-appropriate child behaviors. When questioned regarding how she would expect Mother to demonstrate learned parenting skills, Ms. Buckner, who had observed most of the visits between Mother and the Children, explained:

To be appropriate with the children during visits. She has called Gabe stupid, called him a dummy, not taken them to the bathroom so that they did urinate on themselves and things like that. She's not – when they become upset, she's not able to comfort them, she's not able to provide any structure or discipline during the visits.

The Children's foster mother testified that she had observed many visitation sessions between Mother and the Children, usually from a side observation room. She stated that she had heard Mother call Gabriel a "heathen" and a "moron." According to the foster mother, Gabriel was particularly upset after one visit and complained to both her and his teacher that Mother had called him "stupid." The foster mother noted that Mother has more trouble relating to and disciplining Gabriel than the other two children.

Jenna Rejman, a family intervention specialist who supervised Mother's therapeutic visitation with the Children from January or February 2012 through August 2012, testified that she worked with Mother on improving parenting skills during visitation sessions. Ms. Rejman opined that Mother was resistant to her parenting instruction and often appeared to be "stuck" on how she remembered being told to address parenting issues in the past rather

than being open to new information. According to Ms. Rejman, Mother often wanted to discuss diagnoses she believed the Children had been given in the past rather than address the Children's actual behavior during the visitation. A CASA volunteer who also had observed visitation between Mother and the Children testified that she had seen Mother ignore Gabriel when he was crying until a DCS caseworker eventually intervened to distract and calm the child. Mother testified that she felt she was always being corrected in her parenting during visitation. She believed that ignoring undesirable behavior was the best way to manage such behavior and that she did not expect more from the Children "than what they can do." She denied ever calling any of the Children derogatory names.

The first permanency plan also required Mother to complete a psychological evaluation and follow the resultant recommendations. It is undisputed that Mother completed a psychological evaluation at Good Samaritan Center in Vincennes, Indiana, in July 2011. Good Samaritan's evaluation raised concerns about Mother's former juvenile diagnosis of borderline personality disorder and recommended that Mother seek further mental health treatment. Mother did not seek further treatment in Indiana. When Mother returned to Tennessee and reported to DCS that she did not agree with the results of her evaluation at Good Samaritan, DCS consented to have Mother undergo a new psychological evaluation in Tennessee, with such evaluation becoming a requirement of the second permanency plan.

Mother completed a psychological evaluation conducted by Dr. James F. Murray, licensed clinical psychologist, whose deposition testimony was admitted at trial. Dr. Murray concluded in his evaluation that "the record offers very strong support for a present diagnosis of severe personality disorder involving aspects of borderline and antisocial personality disorders." Dr. Murray stressed in testimony that his role was to evaluate Mother's mental status rather than treat Mother. Mother was resistant to the evaluation process and refused to undergo a mental health assessment intake for treatment. She testified that she knew from Indiana family services' involvement with her family that she had been a victim of abuse as a child and that she did not want to undergo therapy that would make her relive negative memories she had forgotten.

The requirement that Mother resolve her criminal warrants outstanding in Indiana was included in the second and third permanency plans. At trial, DCS presented certified warrants from the Superior Court of Knox County, Indiana, issued against Mother for failure to appear on charges of check deception and cruelty to an animal. According to the case history on the warrants, the original summonses were issued and served on Mother in April 2009. The warrants for failure to appear were served on Mother on July 30, 2011, after she had returned to Indiana. The case history further reflects that Mother entered an appearance by video on August 3, 2011, pleading not guilty and requesting trial. Mother's trial on these charges was set for December 5, 2011, by which time she was again in Tennessee. The Knox

County, Indiana court subsequently issued warrants for Mother's failure to appear on December 5, 2011. DCS obtained certified copies of the active warrants in September 2012. Ms. Buckner testified that she was informed by the Knox County, Indiana District Attorney's Office that Indiana did not extradite on the charges facing Mother but that the warrants were still active. Mother testified at trial concerning this matter that she was the victim of identify theft in Indiana in 2009 and that she believed the person who stole her identity was responsible for the criminal charges against her.

As for Mother's participation in the Children's medical appointments, Ms. Buckner testified that Mother missed several appointments and was so disruptive during the appointments she attended that medical providers often had to request that she stop being disruptive. Ms. Buckner explained that she was present at Gracie's appointment with an ophthalmologist in November 2011 when Mother entered late while Gracie was sitting on the foster mother's lap and being examined. According to Ms. Buckner, Mother insisted on holding Gracie and kept talking to her and distracting her during the examination. Mother then told the doctor that Gracie needed a retina transplant. The ophthalmologist attempted to explain that there is no such procedure as a retina transplant, and Mother became "very angry."

Ms. Buckner and the foster mother testified that Zachary was diagnosed with bilateral ear infections immediately after being taken into protective custody. He also had a "tongue tie" that interfered with his developing speech. According to both witnesses, when an ear, nose, and throat specialist recommended in August or September 2011 that Zachary have tubes placed in his ears and the tongue tie clipped, Mother refused to give permission, stating that previous doctors had told her Zachary did not need surgery. DCS petitioned for the trial court to authorize the procedure, and by the court's order entered November 4, 2011, the court authorized the procedure and noted that Mother had agreed to it. Ms. Buckner testified that Zachary's eardrum ruptured approximately two weeks before he had the ear surgery. Zachary's tongue tie was also clipped during the same procedure, which occurred when he was sixteen months old.

Mother testified she missed Gracie's first appointment arranged by DCS because she could not secure the time off from her employment at CVG. She acknowledged that during Gracie's November 2011 appointment with the ophthalmologist, she raised the diagnosis she had been given by Gracie's doctor in Florida. She stated that the ophthalmologist explained there was no retinal transplant available, and she was not aware of any disruption to the appointment. According to Mother, she attended Gabriel's dental surgery but was not informed of his pre-surgical dental appointments. Regarding Zachary's surgery, Mother explained that she had been told by a doctor in Florida that clipping the tongue tie might only be a "cosmetic" option if the condition did not prove to interfere with the child's speech.

When DCS requested authorization for Zachary's surgery, Mother inquired as to whether it was necessary or cosmetic. She asserted that Zachary had not suffered from ear infections before being removed into protective custody but that she had not been opposed to the surgery to have tubes placed in his ears.

Regarding a parent's substantial noncompliance with a permanency plan, as this Court has previously explained:

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance.

*In re M.J.B. & M.W.S., Jr.*, 140 S.W.3d 643, 656-57 (Tenn. Ct. App. 2004) (internal citations omitted).

Although Mother argues that the requirement that she obtain a second mental health evaluation in Tennessee was not reasonable, she otherwise concedes that her permanency plan requirements were reasonable and related to the conditions that led to the removal of the Children. Mother raises no issue regarding the trial court's finding that DCS made "extensive reasonable efforts" to assist her in complying with the permanency plans. Mother's contention that she substantially complied with the plans, as stated in her brief on appeal, rests on her argument that she "attempted to do everything that DCS required" but found it impossible to fully comply with the plan requirements because DCS kept "moving the goal posts" by requiring her to address concerns regarding her mental condition and participation in the Children's medical treatment. We disagree.

Dr. Murray testified that his sessions with Mother served the purpose of providing a psychological evaluation, not the mental health intake assessment Mother needed to begin therapeutic counseling and treatment. Dr. Murray's evaluation and testimony, as well as testimony from multiple witnesses and Mother herself, whose testimony was often disjointed and contradictory, demonstrated that the permanency plan requirement of a follow-up mental health intake assessment was reasonable. As noted above, Mother's mental condition was

directly related to her ability to provide a suitable home. *See In re M.F.O.*, 2009 WL 1456319 at *5.

Furthermore, Mother's ability to appropriately participate in the Children's medical care was reasonably related to her ability to care for the Children. The evidence repeatedly demonstrated that the Children's medical history as offered by Mother was contradictory, bizarre, and unsubstantiated, including, for example, her insistence that Zachary must be watched during his "eighteen-month birthday" to be sure he did not turn into a "vegetable," regressing to a "newborn stage," as she reported Gabriel had at that age. We stress again that the trial court's determinations regarding witness credibility are entitled to great weight on appeal. *See Jones,* 92 S.W.3d at 838. The trial court did not err in terminating Mother's parental rights based upon the statutory ground of substantial noncompliance with the statements of responsibilities in the permanency plans.

## VI. Persistence of Conditions Leading to Children's Removal

The trial court also found that Mother's parental rights should be terminated based upon the statutory ground of persistence of the conditions leading to the Children's removal into protective custody. As with the ground of failure to provide a suitable home, Mother does not address directly in her brief on appeal the trial court's finding regarding persistence of conditions. She does, however, raise the issue of the trial court's ruling as to all grounds for termination and argues that she substantially complied with DCS's requirements that she correct issues of abandonment and lack of housing, two conditions that led to the Children's removal. Despite Mother's failure to address this ground directly in her argument, we will nonetheless address it in our analysis due to the "importance of permanently placing children and the just, speedy resolution of cases." *See In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010).

Tennessee Code Annotated § 36-1-113(g)(3) provides as an additional ground for termination of parental rights:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

-14-

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . . .

The trial court made the following findings with regard to this statutory ground:

In this case, the Court finds by clear and convincing evidence that it has been twenty months since the children were removed from [Mother]; that DCS removed the children from [Mother] due to her homelessness and her inability to care for the children; that the conditions that led to the children's removal still persist in that the mother has not maintained a stable housing situation; that there is little chance that those conditions will be remedied at an early date [so] that the children can be returned to [Mother's] home; and that the continuation of the parent/child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home. Evidence and testimony show that [Mother] has resided in multiple homes since the time that [the] children were removed; that she is now residing with her paramour who has, by his own admission and [Mother's], failed to comply with the Department's request that he submit to an alcohol and drug assessment; and that evidence and testimony have shown that [Mother] has been unable to demonstrate during visitations that she would be able to care for the children. Further, this Court finds that another condition exists which would in all reasonable probability cause the children to be subjected to further abuse or neglect in that [Mother] has not addressed her mental health issues. Her mental health issues existed at the time of the removal and they still exist. Thus, the Court finds that the State has met the burden of proof on this ground.

Upon a thorough review of the record, we conclude that these findings are supported by a preponderance of the evidence. The Children were removed for a period of more than six months, and the predominant conditions leading to removal, namely Mother's homelessness, inability to care for the Children, and problematic mental state, still persist. There is little likelihood that these conditions will be remedied in the near future. The evidence at trial demonstrated that Mother had failed to establish a suitable home for the Children, failed to demonstrate that she could properly care for the Children, and failed to address her own mental health issues. *See, e.g., In re M.J.B. & M.W.S.,* 140 S.W.3d at 658

(concluding that the mother's inability to provide and care for her children persisted in part due to her own psychological difficulties).

Mother emphasizes that she was gainfully employed by the time of trial and had obtained a physically adequate home. As noted previously, however, Mother, although still legally married to Father, had established a home with a paramour who had failed to comply with DCS's requests for an alcohol and drug assessment or explain why he did not have custody of his own child. The evidence also demonstrated that continuation of the parent-child relationship would greatly diminish the Children's chances of integration into a safe, stable, and permanent home. We conclude that the trial court properly terminated Mother's parental rights based on this statutory ground as well.

## VII. Mental Impairment

The final statutory ground upon which the trial court terminated Mother's parental rights related to the finding that Mother's mental condition was impaired to the point of being unable to provide for the further care and supervision of the Children. Tennessee Code Annotated § 36-1-113(g)(8) provides in pertinent part as an additional ground for termination of parental rights:

> (8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;
>
> (B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
>
> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

-16-

(ii) That termination of parental or guardian rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated . . . .

*See also State, Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338-39 (Tenn. 1990) (holding that a parent's mental disability may be a ground for termination of parental rights when such termination is in the child's best interest even when the mentally disabled parent's actions are not willful).

In its order terminating Father's and Mother's parental rights, the trial court summarized its findings of fact and conclusions of law regarding mental incompetence as follows:

In this case, the Court finds that there is clear and convincing evidence that termination of [Mother's] parental rights is proper on this ground in that testimony and evidence have shown that [Mother's] mental competence is questionable at best. Dr. Murray's testimony and evaluation show that [Mother] is mentally impaired and that this condition is likely to continue. Further, the evaluation and testimony show that [Mother's] symptoms are problematic for adequate parenting. The Court finds by clear and convincing evidence that the State has met the burden of proof on this ground.

Upon careful and thorough review, we conclude that a preponderance of the evidence also supports the trial court's findings on this ground. In his psychological evaluation of Mother submitted to the trial court, Dr. Murray summarized Mother's mental condition as follows:

[Mother's] history identifies severe disturbance and abuse within her family of origin and possibly in subsequent situations. She has clearly lived a highly unstable and chaotic life from childhood through adulthood. It appears very likely she has become psychiatric-treatment and social-service "savy" [sic] such that she has learned how to talk about, manipulate, or exploit these systems. Her own reports of past behavior during childhood and adolescence is highly consistent with a conduct disorder diagnosis, as well as other severe psychiatric disorders. Similarly, the record offers very strong support for a

-17-

present diagnosis of severe personality disorder involving aspects of borderline and antisocial personality disorders. Her evasiveness and other features of her failure to forthrightly participate in the present evaluation (as well as another recent evaluation) render confident inclusion or exclusion of Axis I or Axis II diagnoses problematic. However, her characteristic features of failure to conform to social norms, deceitfulness, impulsivity or poor planning, irritability or aggressiveness, disregard for others or irresponsibility, and a willingness to exploit or manipulate others are obviously problematic behavioral or personality features with regard to a capacity for adequate parenting. Other symptoms involving depression and anxiety are also likely to be problematic for her across a wide range of important areas of adaptive functioning, including parental functioning.

In addition, testimony from DCS personnel included several examples of bizarre behavior exhibited by Mother while the Children were in protective custody. Much of this behavior directly affected the Children, for example, telling the Children to remove all their clothing while they ate dinner during one visit and declaring that Gracie was having seizures when the child showed no signs of physical distress and had no documented history of seizures. As noted previously, Mother was dismissive of the results of her psychological evaluation and refused to undergo additional mental health assessment and counseling.

In support of her argument that the trial court erred in finding clear and convincing evidence of mental impairment, Mother relies on this Court's decision in *In re Christopher S.*, No. E2012-02349-COA-R3-PT, 2013 WL 5436673 at *17 (Tenn. Ct. App. Sept. 27, 2013), in which we reversed the trial court's finding that the parents were mentally incompetent to parent because the evidence demonstrated that the intellectually disabled parents "could learn to competently parent with intensive, long-term intervention." Mother notes our citation in *In re Christopher* to the earlier case of *State, Dep't of Children's Servs. v. Whaley*, No. 2001-00765-COA-R3-CV, 2002 WL 1116430 at *14 (Tenn. Ct. App. May 30, 2002), in which this Court reversed the trial court's finding of mental incompetence when a mildly intellectually disabled mother "had successfully obtained vocational training, maintained employment, utilized public transportation, maintained a household, and secured a competent support system." *See In re Christopher*, 2013 WL 5436673 at *17 (citing *Whaley*, 2002 WL 1116430 at *14).

We find both *In re Christopher* and *Whaley* to be factually distinguishable from the case at bar. The trial court's finding as to Mother's mental state focuses not on intellectual disability but on Mother's psychological evaluation describing severe personality disorder and aspects of borderline and anti-social personality disorders, including her often erratic and contradictory behavior and self-reported history. The trial court specifically found that

Mother's symptoms are "problematic for adequate parenting" and unlikely to be resolved in light of Mother's dismissive attitude toward mental health treatment and her refusal to undergo additional assessment and the treatment that would follow. *See, e.g., State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 336-37 (Tenn. 1990) (affirming the trial court's termination of the parents' parental rights upon the ground of the mother's mental impairment of schizophrenic disorder, paranoid type, together with the mother's refusal to take needed medication or undergo counseling and the father's refusal to recognize the seriousness of the mother's mental condition). The trial court did not err in terminating Mother's parental rights on this statutory ground.

## VIII. Best Interest of Children

When a parent has been found to be unfit by establishment of a statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee Code Annotated § 36-1-113(i) (2010) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances[3] as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In determining that termination of Mother's parental rights was in the best interest of the Children, the trial court stated:

In this case, the Court finds that there is clear and convincing evidence that termination of [Mother's] parental rights is in the best interest of the children in that, in addition to all the reasons set forth in the Findings of Fact

_____

[3]Effective July 2012, after the filing of the petition in the instant case, The Tennessee General Assembly amended Tennessee Code Annotated § 36-1-113(i)(7) to substitute "alcohol, controlled substances or controlled substance analogues" in place of "alcohol and controlled substances." *See* 2012 Pub. Acts ch. 848, § 8.

above, [Mother] has not made changes in her conduct or circumstances that would make it safe for the children to go home.

[Mother] has not made lasting changes in her lifestyle or conduct after reasonable efforts, so that lasting change does not appear possible. Despite all of the help that was offered to her, [Mother] has been unable to demonstrate that she can appropriately parent the children. If she cannot succeed under those circumstances, it appears that she cannot maintain a lifestyle of conduct for a lasting period of time that would make it safe for the children to return to her.

[Mother] does not have a meaningful relationship with the children. Testimony and evidence has shown that the children do not appear to have a bond with the mother and view her as more of someone they visit with than as a parent. There is no question to the Court that [Mother] loves her children. However, she has uprooted them and moved them about in a cavalier fashion. She has demonstrated to the Court that the Court cannot trust her judgment when it comes to the medical needs of the children. The main concern to the Court is that she actually thought her actions were appropriate but in the Court's mind they were completely inappropriate. [Mother] leads a bizarre lifestyle of repeated relationships with men that she does not really know which the Court does not feel is in the children's best interest.

By all accounts, the children are thriving in their current environment and they have developed a strong bond with their foster parents who wish to adopt them. Thus, the Court finds that the termination of [Mother's] parental rights is in the best interest of the children for the reasons set forth above.

The trial court therefore concluded that it was in the Children's best interest to terminate Mother's parental rights. We agree.

Mother contends that the trial court erred by reaching the best interest analysis because the State failed to prove the statutory grounds for termination of her parental rights by clear and convincing evidence. Mother offers no further argument to refute the trial court's finding that termination of her parental rights was in the Children's best interest. Although Mother has essentially conceded this issue on appeal through her lack of supportive argument, DCS properly has argued the issue. Having found a ground for termination of parental rights, a trial court is required to consider, as we must on review, whether termination of those rights is in the Children's best interest. *See* Tenn. Code Ann. § 36-1-113(i); *In re Audrey S.*, 182 S.W.3d at 877.

In analyzing the factors contained in Tennessee Code Annotated § 36-1-113(i), the trial court emphasized six factors as weighing heavily against maintaining Mother's parental

rights: (1) failure to make an adjustment of circumstance, conduct, or conditions as to make it safe and in the Children's best interest to be in Mother's home; (2) failure to effect a lasting adjustment after reasonable efforts by DCS for such a period of time that adjustment does not reasonably appear possible; (4) lack of meaningful relationship with the Children; (5) negative effect a change of caretakers and physical environment would be likely to have on the Children's emotional, psychological, and medical condition; and (8) detrimental effect of Mother's mental status on the Children and on Mother's ability to provide safe and stable care and supervision for the Children. We note also that it is undisputed that Mother paid no child support while the Children were in protective custody. *See* Tenn. Code Ann. § 36-1-113(i)(9); *White*, 171 S.W.3d at 194 (taking notice of the appellate record in affirming the trial court's best interest finding).

The trial court noted Mother's love for the Children and did not discount the statutory factor of her regular visitation with them once she returned to Tennessee. *See* Tenn. Code Ann. § 36-1-113(i)(3). As the trial court explained, however, testimony from those who observed Mother's visitation with the Children, including Ms. Buckner, Ms. Rejman, and the foster mother, demonstrated that the Children did not display signs of a meaningful bond with Mother beyond familiarity with her as someone they visited regularly. Gabriel, in particular, showed signed signs of negative effects from the visitation and from being characterized by Mother has having greater developmental problems than he actually suffered.

The foster mother, who had cared for Zachary since the Children were taken into protective custody and for Gabriel and Gracie since late July 2011, stated that all three Children had made great strides in their developmental progress while in protective custody. She and her husband intended to adopt the Children if they become available for adoption. According to the foster mother and Ms. Buckner, several problems Mother believed the Children suffered were resolved while they were in foster care. Contrary to Mother's original assertion to DCS, Gabriel has been found not to suffer from autism. In addition, Gabriel's kindergarten teacher from the 2011 to 2012 academic year and his current first grade teacher testified that Gabriel's previously garbled speech had improved dramatically and that he had become an excellent reader. All three Children were receiving speech and occupational therapy, the two oldest through school services as well as in-home services. Ms. Buckner noted that contrary to Mother's original account to DCS, Gracie was found not to suffer from any kind of seizure disorder. Gracie was severely cross-eyed at the time of removal into protective custody and would not talk or smile. Gracie has since undergone corrective eye surgery, and the foster mother described her as a previously shy child who now laughs, hugs, and smiles.

Testimony from Ms. Buckner, Ms. Rejman, and the foster mother demonstrated that by the time of trial, the Children showed a bond among themselves, particularly between the older children and Zachary, that was not apparent at the time of removal from protective custody. Zachary suffered from a "tongue tie" and ear infections at the time of removal, and these problems were successfully treated. From a thorough examination of the record before us, we conclude that there is clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest.

## IX. Conclusion

The judgment of the trial court terminating the parental rights of Mother is affirmed. Costs on appeal are taxed to the appellant, Donna B. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE